**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 98-50382

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

JAIME ARIZA-SALAZAR,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Texas

(EP-97-CR-892-1-DB)

April 1, 1999

Before JOLLY, WIENER, and PARKER, Circuit Judges.

PER CURIAM:[*]

Appellant Jaime Ariza-Salazar ("Ariza") was charged with possession with intent to distribute a controlled substance, 21 U.S.C. § 841(a)(1), and conspiracy to commit such offense in violation of 21 U.S.C. § 846. Ariza filed a motion to suppress all evidence, alleging the evidence resulted from an illegal search and seizure. The United States District Court for the Western District of Texas denied Ariza's motion to suppress the evidence. Pursuant to a conditional plea agreement, Ariza entered guilty pleas to both counts of the indictment, but he reserved the right to appeal the denial of his motion to suppress. Ariza now appeals. We AFFIRM.

---

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

## I. FACTS AND PROCEEDINGS

On September 13, 1997, Ariza and his companion, German Antonio Rojas-Rojas ("Rojas"), entered the El Paso Airport in El Paso, Texas on their way to New York, New York. Aubrey Terrel ("Agent Terrel"), a border patrol agent, was working undercover in the airport that day.

At approximately 5:00 p.m., Agent Terrel observed two men, Ariza and Rojas, walking very close together and not talking to one another. Agent Terrel noticed that Ariza and Rojas were neatly dressed and wearing new shoes.[1] Agent Terrel also noticed that the men seemed unfamiliar with airport procedures. Under these circumstances, Agent Terrel became suspicious that Ariza and Rojas were illegal aliens and decided to follow them.

After Ariza and Rojas cleared the security checkpoint, Agent Terrel approached them and, in English, asked them about their citizenship. As Ariza and Rojas did not seem to understand his question, Terrel asked them again in Spanish. Ariza and Rojas responded that they were from Mexico and showed Agent Terrel their Mexican drivers licenses. Ariza and Rojas, however, did not produce any documentation to be in the United States. At this point, Agent Terrel detained Ariza and Rojas for being in the United States illegally.

After Ariza and Rojas were detained, they were transferred to the border patrol office for questioning. At the office, Ariza and Rojas admitted they did not have permission to be in the United States. The border patrol agents questioned the two men in order to determine their country of origin. Ariza and Rojas changed their answers and gave locations inconsistent with their accent and dialect of Spanish. The border patrol agents suspected the men were possibly from Columbia, South America, not Mexico. The agents searched for, but did not find, citizenship documents in Ariza's bag. It was clear that Ariza did not have time to dispose of documentation following his first contact with Agent Terrel.

At approximately 6:00 p.m., border patrol agents transferred Ariza and Rojas to the main

---

[1] Agent Terrel testified that being well-dressed and having new shoes were possible indicators of illegal aliens.

border patrol station to be processed for deportation. At this time, Ariza and Rojas received their Miranda warnings, and each signed a statement acknowledging he had been read his rights and understood them. Under further questioning, Ariza claimed to be from Guatemala. The border patrol agent believe that this was inconsistent with Ariza's accent, dialect, and physical features, and decided to search him for evidence of citizenship. The purpose of this search was to locate such items as passports, visas, citizenship papers, and clothing tags.

To conduct this search, two border patrol agents led Ariza to a small, windowless room. Ariza proceeded to remove his shoes, his socks, and then his shirt. Finally, he removed his pants. The agents did not find any documents or other indications of citizenship in his clothing or on his body. The agents, however, did notice two white bulky objects inside Ariza's underwear. One of the agents asked Ariza to remove the objects so that the agent could to determine whether they might be drugs or weapons. Upon finding the objects were socks, the agents unfolded them and discovered 85 rubber capsules containing a white substance. Later, laboratory tests identified the substance as heroin. The agents also found 55 more capsules hidden in a white sock in Rojas's underwear. Further, Ariza directed border patrol agents to more drugs in his luggage and shoes. Ultimately, the agents located 7.3 pounds of heroin.

Rojas pleaded guilty to Count I of the indictment. The district court, on the motion of the government, dismissed Count II of Rojas's indictment. Ariza filed a motion in the district court to suppress the evidence. After a hearing, the district court denied the motion to suppress. Ariza entered a guilty plea to both counts of the indictment, expressly reserving the right to appeal the district court's denial of the motion to suppress.

## II. DISCUSSION

A. Standard of Review

Ariza appeals the district court's denial of his motion to suppress the evidence discovered during and subsequent to the strip search. Specifically, Ariza contends that the border patrol agents conducted an unreasonable strip search in violation of the Fourth Amendment and that all evidence

3

derived from that search should be suppressed.

This court reviews conclusions of law contained in rulings on suppression motions *de novo*. *See United States v. Fields*, 72 F.3d 1200, 1212 (5th Cir. 1996). A district court's factual findings are reviewed under the clearly erroneous standard. *See id*. The record is reviewed in the light most favorable to the prevailing party. *See United States v. Maldonado*, 42 F.3d 906, 908 (5th Cir. 1995).

B. Fourth Amendment Analysis

Ariza contends that the strip search violated the Fourth Amendment. The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons... against unreasonable searches and seizures...shall not be violated...." The test of reasonableness under the Fourth Amendment "requires a balancing of the need for the particular search against the invasion of personal rights the search entails." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). In particular, the court must consider (1) the scope of the particular intrusion; (2) the manner in which it is conducted; (3) the justification for initiating it; and (4) the place in which it is conducted. *See id.* After considering these factors, we conclude the strip search was not unreasonable under the facts of this particular case.

The first factor, scope of the particular intrusion, weighs in favor of reasonableness. In this situation, the border patrol agents were interested in establishing Ariza's citizenship to prepare him for deportation. The agents reasonably believed that Ariza illegally entered the United States. Believing he was an illegal alien, the agents questioned Ariza regarding his identity and nationality. Ariza, however, continually gave the agents false and inconsistent information regarding his citizenship. For example, Ariza altered his story on his place of residence and the agents noted his accent and dialect deviated from those common to the country where he claimed to live.

An agent also searched Ariza's bag for evidence of his true identity and citizenship but found none. Further, it is clear that Ariza did not have an opportunity to dispose of identification or documentation of citizenship between the time of his first encounter with border patrol agents and the time he was strip searched. Because the agents could not locate any such identification, and

4

because illegal aliens are known to hide their true identification on their persons, the agents decided to conduct a strip search. There is no evidence of a more intrusive cavity search having been conducted.

The second factor, the manner of the search, also weighs in favor of reasonableness. Once the border patrol agents decided to subject Ariza to a strip search, they did so in a unobtrusive manner. Ariza was taken to a place of privacy and allowed to remove his own clothing, one article at a time. He proceeded to remove his shoes, his socks, his shirt, and finally his pants. Once Ariza stripped down to his underwear, the socks that were secreted therein were clearly apparent to the agents. There is no evidence that the agents intimidated or threatened Ariza, or that the search was videotaped.

The third factor, justification for the search, also weighs in favor of reasonableness. The agents reasonably believed that Ariza illegally entered the United States. Before resorting to the strip search, the agents took less intrusive steps to determine Ariza's place of residence, including questioning Ariza and searching his luggage for identification. The agents only decided to search his person for hidden documentation after Ariza made false statements and after his bag was found to contain no other documentation.

Finally, the location of the search also weighs in favor of reasonableness. The agents took Ariza to a small, windowless room in the border patrol station where the door was closed or nearly shut. Considering that he was not required to remove his underwear and that only two agents were present, the location was sufficiently private.

Under the facts and circumstances of this case, the strip search of Ariza for documentation or identification relating to his country of origin was not unreasonable under the *Wolfish* factors. The district court's denial of Ariza's motion to suppress the evidence is AFFIRMED.